[Civ. No. 22708. Second Dist., Div. One. Mar. 13, 1959.]

Estate of JESSIE McGEE, Deceased. ANNA BRENNAN et al., Appellants, v. MARY E. SEELIG, as Administratrix, et al., Respondents.

Martin S. Ryan, Guy F. Bush, James H. Lyons and Warren M. Goodwin for Appellants.

Julius A. Leetham for Respondents.

LILLIE, J.—Jessie McGee died intestate and without children on November 19, 1955. Thereafter, the relatives of her predeceased intestate husband, Denis, filed a petition in the probate proceedings claiming an interest as statutory heirs under section 228, Probate Code. They contended that all of Jessie's estate had been acquired with community funds during her marriage to Denis and prior to the latter's death; and Jessie having died without issue, one-half of her estate was distributable to them by force of the statute. The petition was opposed by contestants, all of whom are Jessie's next of kin. The trial court found that at the time of Denis' death there existed no community property to which Jessie succeeded, that all property owned by Jessie upon her death had its origin in, and was, her separate property and vested in the contestants under section 225 of the Probate Code; and issued its decree accordingly. This appeal therefrom involves solely the sufficiency of the evidence to support the trial court's findings.

The evidence as to the general financial arrangements of Jessie and Denis, including the source of the funds used to purchase the principal asset of the estate, is somewhat meager. As a consequence, the parties rely upon and discuss various

inferences and presumptions without the aid of which a finding either way might have been difficult to support.

The following appears from the record: Jessie, a native of England, came to Los Angeles about 1920. She was approximately 30 years of age and unmarried. On March 14, 1922, with savings accumulated from some employment, she acquired an interest, as a single woman, in a three-bedroom house on 91st Street. The total price under the contract of purchase was $3,000, payable $500 down and $35 monthly, commencing April 14, 1922, with interest at 7 per cent annually. The following February (1923) she married Denis. At that time, being neither employed nor possessed of funds or property, he moved into the 91st Street house with Jessie. Following the marriage, Jessie was never again gainfully employed and her income appears to have been derived exclusively from rentals and the sale of various real properties. Denis worked for about a year between 1933 and 1934, and for some 10 years during the 1940's. Neither he nor Jessie acquired any property by gift, devise or inheritance.

On March 25, 1925, by quitclaim deed executed by both Denis and Jessie, the interest in the 91st Street property was disposed of and title taken by them by way of grant deed to a 10- or 12-room house on Stanford Avenue, referred to hereinafter as the Warner transaction. In 1938, Jessie and her husband conveyed away the Stanford Avenue house and acquired by deed to ''Jessie McGee, a married woman,'' an apartment building situated at 624 Towne Avenue. Subsequently, in 1944, Jessie alone transferred title to the Towne Avenue building and received a deed, in her name only, to a 17-room rooming house on West 2nd Street. Shortly thereafter, she disposed of this property, and title was taken to the remaining real property in the estate, an apartment house on West 4th Street, in the names of Jessie, Denis and Mary E. Seelig, Jessie's sister and one of the contestants herein, as joint tenants. Later, and prior to Denis' death, Mrs. Seelig conveyed her interest to Denis and Jessie, also as joint tenants. Another property was purchased by Jessie alone in 1950 and sold some two years later for a substantial profit.

Denis died intestate in 1953, predeceasing Jessie by two years. There was no administration of his estate.

During his 11 years of employment out of 31 years of marriage, he kept his own separate bank account which was closed in 1950. Upon Jessie's death, her estate had a total inventoried

value approaching $118,000, represented mainly by about $12,500 cash on deposit and the 4th Street apartment building appraised at $90,000.

There can be no doubt that the estate thus accumulated came about, as both sides observe, from a process of parlaying profit upon profit from a beginning that was both modest and obscure. The question before us concerns the sufficiency of the evidence to sustain the finding that Jessie's original investment could thus multiply in value over a span of 30-odd years and still retain its separate property status. Appellants assert that the trial court's determination in this regard was unsupported by fact and unsound in law. They argue that the burden of proof was on the respondents to establish by clear and convincing evidence that the property in Jessie's estate was separate property, citing *Estate of Jolly,* 196 Cal. 547 [238 P. 353]; *Estate of Duncan,* 9 Cal.2d 207 [70 P.2d 174]; *Wilson* v. *Wilson,* 76 Cal.App.2d 119 [172 P.2d 568]; and *Estate of Kane,* 80 Cal.App.2d 256 [181 P.2d 751]. Those decisions all hold, being aided by the pertinent portion of section 164, Civil Code, declaring certain property acquired during coverture to the community, that property in the possession of one spouse at the close of a long marital relation must be presumed to be community absent the establishment of a better right by the spouse claiming it as separate property.

█ Appellants are relatives of the predeceased Denis. By section 228, they became statutory heirs of Jessie, provided they could prove that any part of her estate was in fact the community property of Jessie and Denis. Such proof was a condition precedent to recovery by them. As declared in *Estate of Rattray,* 13 Cal.2d 702, 706 [91 P.2d 1042] : "Since their right to inherit depended not merely upon the fact of that certain relationship, but upon the fact of such relationship plus the fact that property claimed by them as heirs had formerly been the community property of the decedent and her predeceased spouse, the burden of showing such additional fact rested upon them." To the same effect are *Estate of Doran,* 138 Cal.App.2d 541, 549 [292 P.2d 655], and *Estate of Adams,* 132 Cal.App.2d 190, 203 [282 P.2d 190]. █ Appellants profess their cognizance of the foregoing rule and further concede that it is primarily a factual question whether the disputable presumption arising from section 164, Civil Code, and accorded additional sanction in *Estate of Jolly, supra,* 196 Cal. 547, *Estate of Duncan, supra,* 9 Cal.2d 207, and *Wilson* v. *Wilson, supra,* 76 Cal.App.2d 119, has been

sufficiently overcome. ■ Likewise recognized by appellants is the principle that a finding will not be disturbed if there is substantial evidence or reasonable inference to support it. ■ The instant case, appellants nevertheless argue, presents a situation where "there was neither substantial evidence nor reasonable inference to support the finding that the property herein involved was the separate property of Jessie" and that "such finding was in hasty and flagrant disregard of the evidence and of the applicable law as well."

In support of the foregoing thesis there follows a purely partisan evaluation of the facts, various items of testimony being enumerated which might well have sustained the conclusion contended for. Thus, appellants point out that the only separate property of Jessie directely traceable to her present estate consisted of an equity in the 91st Street property which could not have exceeded $850 (10 monthly payments being included) at the time of her marriage to Denis; that the place produced no income save and except rent of an undetermined amount paid by her brother; that the possession of money or a bank account by Jessie is left to mere surmise and that, although unemployed after her marriage, the decedent apparently did not default under the contract of purchase and thus was able to dispose of her equity at the time of the Warner transaction some three years later and secure in exchange the rooming house on Stanford Avenue. Appellants argue in effect that Denis must then have been working or otherwise contributing to the community's support, failing which they would have been dispossessed in the interim.

There is no evidence that Denis was employed at the time in question or at any subsequent time until 1933 when he worked for approximately one year for wages of an undisclosed amount. Opposed to the conclusion which appellants would have us draw is the testimony of Mrs. Seelig, the only witness who knew the parties at the time of their marriage and thereafter. She testified that she did not know "the exact amount of money" Jessie had when she married Denis; that Jessie was "the brains of the family," handled all the business transactions and all the money and that the couple's living habits were moderately frugal. Undoubtedly the trial court, accepting as true the testimony of this witness despite her interest, had in mind the inference, reflected by its finding, that the parties must have been principally maintained out of the income, commencing initially with Jessie's original venture

in the Los Angeles real estate market, and that the estate of which she died possessed resulted from the income and profits growing from that first modest investment. Appellants vigorously criticise the trial court's analysis of the Warner transaction three years later, pointing out that there was absent any evidence that payments were kept up by Jessie on the 91st Street contract and that she therefore had no equity to offer in return for the Stanford Avenue property. True, revenue stamps were not affixed to the quitclaim deed tendered by Jessie and Denis and the grant deed to Katherine Warner was in fact executed by the vendors of the 91st Street premises and bore stamps indicating a consideration of $6,500. As we see it, there was a basis for the trial court's analysis that the 91st Street premises increased in value during the three years it was held and was disposed of at its increased value.

No purpose would be served by further elaboration on the several transactions which followed and added to the value of decedent's estate. ▆ "In determining the character of property for the purpose of applying sections 228 and 229 of the Probate Code, it is the source of its acquisition, and not the nature of its ownership immediately before death, which is controlling" (*Estate of Reizian*, 36 Cal.2d 746, 749 [227 P.2d 249]). ▆ Separate property does not lose its character as such by reason of a change in form or identity (10 Cal. Jur.2d 680, § 18). ▆ Additionally, the fact that separate property is placed in joint tenancy with the other spouse does not affect its character as the separate property of the granting spouse when the joint tenancy terminates on the death of the grantee spouse (*Estate of Rudman*, 85 Cal.App.2d 270 [193 P.2d 39]). ▆ Appellants contend, reasserting such contention upon oral argument, that proper consideration was not given to the fact that title to the 4th Street apartment building stood in the parties' names as joint tenants. If we understand appellants' argument correctly, it is similar to that rejected in *Estate of Abdale*, 28 Cal.2d 587 [170 P.2d 918], wherein the property was originally separate property of the intestate, thereafter placed by him in joint tenancy with his wife and on her death reacquired by him as surviving joint tenant. The court held that if the property had its source as separate property of the surviving spouse, it was distributable under sections 225 and 226 of the Probate Code to the kin of the surviving spouse. (28 Cal.2d 591.) In the last analysis, there seems to be no escape from the conclusion that this phase of the appeal involves factual questions which

were determined adversely by the trial court with an apparent full understanding of the rule that then guided its decision. Thus, summing up, the court stated: "I am satisfied that the heirs of the predeceased husband have not met the burden imposed by the Rattray case. . . ." Contrary to appellants' assertions, the record does not disclose that the court's conclusion was "hastily" and "precipitantly" arrived at—indeed, every exhibit material to the controversy was received in evidence and it is not contended that sufficient time was denied counsel for the presentation of closing arguments.

There remains for consideration appellants' further point that if Jessie's holdings constituted separate property, its identity as such was lost by commingling. When separate property is intermingled with community funds, the respective properties or funds remain unchanged in character so long as they can be clearly ascertained (*Faust* v. *Faust*, 91 Cal.App.2d 304, 309 [204 P.2d 906]) ; but the presumption in favor of community property (Civ. Code, § 164) applies to commingled property (*Estate of Smith*, 86 Cal.App.2d 456, 473 [195 P.2d 842]) so that the burden of proof rests with the party claiming the property to be separate (*Fountain* v. *Maxim*, 210 Cal. 48, 50-51 [290 P. 576]). "This burden," appellants argue, "respondents have failed to meet." Disputable presumptions, and this is one of them, have been said to be the weakest and least satisfactory character of evidence (*Savings & Loan Soc.* v. *Burnett*, 106 Cal. 514, 529 [39 P. 922]) and "are allowed to stand, not against the facts they represent, but in lieu of proof of them" (*Simonton* v. *Los Angeles T. & S. Bank*, 205 Cal. 252, 258 [270 P. 672]).

Appellants declare that "clear and satisfactory" proof is required to overcome the presumption of commingling; however, the *quantum* of proof is generally a matter for the trial court and that court's determination is conclusive on appeal unless the evidence is so weak and improbable that the finding is without substantial support. (*Estate of Ades*, 81 Cal.App.2d 334, 337 [184 P.2d 1].) Furthermore, the presumption only applies in the absence of other evidence; for example, where it is impossible to trace the source of the funds in view of the commingling (*Thomasset* v. *Thomasset*, 122 Cal. App.2d 116, 124 [264 P.2d 626]). Stated otherwise, the presumption that property acquired during marriage is community is controlling only when it is impossible to trace the source of the specific property (*Gudelj* v. *Gudelj*, 41 Cal.2d 202, 210 [259 P.2d 656]). If we apply the foregoing

rules to the facts at bar, we must only conclude that appellants' present point is untenable. Here the trial court found, upon sufficient evidence, that Jessie's estate upon her death was traceable to her original investment with her separate funds prior to marriage and the accumulations therefrom over the years as the result of shrewd business judgment, coupled with the frugality of her mode of living. Implicit in the court's finding, furthermore, is the fact that any contribution by Denis' earnings was of an undisclosed amount and disproportionate to Jessie's; hence, the principle is applicable that "where the community interest is inconsiderable in the property with which it has been intermingled the community will not draw to itself a separate estate" (*Cline* v. *Cline*, 4 Cal. App.2d 626, 629 [41 P.2d 588]). Also, any suggestion that Jessie's income, or some of it, should be attributed to her services and regarded as community property, lends no assistance to appellants' cause. There is the presumption that expenses of the family come from community earnings (*Huber* v. *Huber*, 27 Cal.2d 784, 792 [167 P.2d 708]), or conversely, there is no presumption that she supported Denis out of her separate funds and preserved intact the community estate (*Thomasset* v. *Thomasset, supra,* 122 Cal.App.2d 116, 126).

 Appellants stress the claim that this was not a situation involving the natural enhancement of property unaided by the efforts of its owners, contending in that regard that the parties' lifelong operation of rooming houses was a "business" and that a large portion of the income therefrom was necessarily expended on amortization payments on notes secured by various trust deeds. However, assuming the care and maintenance of income properties to be in that category, it is not the profits of the business but only the ascertained earnings of the intestate from her individual efforts in managing and caring for such property, in the nature of salary, wages, or the equivalent thereof, which would be community property (*Seligman* v. *Seligman,* 85 Cal.App. 683, 687 [259 P. 984]). Even if it be further assumed that Denis devoted all his time, when he was not gainfully employed otherwise, in assisting Jessie in caring for the property, no evidence has been called to our attention appraising the value of such earnings, or to what proportion of the income they should be properly allocated. True, Jessie's bank balance declined some $25,000 following Denis' death, but that fact standing alone is not conclusively determinative of the problem. "It has been frequently held that a proper method of making such allocation

is to deduct from the total earnings of the business the value of the husband's services to it. The remainder, if any, represents the earnings attributable to the separate property invested in the business" (*Gilmore* v. *Gilmore*, 45 Cal.2d 142, 149-150 [287 P.2d 1769]). We are unable to say that the court committed error in impliedly finding for respondents on this particular issue.

Appellants place great reliance on *Estate of Brenneman*, 157 Cal.App.2d 474 [321 P.2d 86], in which it was held that the burden of proving that some portion of the decedent's estate had its source in his separate estate rested with the decedent's heirs following proof by the heirs of the predeceased spouse that all of said property had been acquired during marriage or had its source in property so acquired. Unlike the situation involving Jessie and Denis, and as the decision points out, "there is no independent evidence as to the source of the property in the surviving spouse other than the fact that it was acquired during coverture" (*supra*, 480); and again, "the evidence is to the effect that all of the property in the estate of decedent was acquired during marriage or had its source in property so acquired, and there is no evidence that any part of such property was acquired with separate property of the decedent" (*supra*, 481), the court thereafter observing that certain funds, concededly separate property in the form of an inheritance, were not traced into the property owned at the time of the husband's death. The case is thus dissimilar factually and no authority for the point appellants seek to make.

From the limited evidence before it, we believe the trial court, basing its decision upon the resolution of conflicting inferences with which we are powerless to interfere, made a proper order of distribution in the matter at bar.

For the foregoing reasons the decree is affirmed. The attempted appeal from the order denying a new trial is dismissed.

White, P. J., and Fourt, J., concurred.